IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SALLY A. FATH, Administratrix      )
of the Estate of                   )
ROGER W. FATH, Deceased,           )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )      Civil Action No. 08-1216
BOROUGH OF CORAOPOLIS d/b/a        )
CORAOPOLIS BOROUGH POLICE          )
DEPARTMENT, SHAWN QUINN, JASON     )
STEWART, JOHN HARING, and          )
TONY BARRAVECCHIO,                 )
                                   )
                Defendants.        )

MEMORANDUM and ORDER

Gary L. Lancaster                              May 3, 2010
Chief Judge.

        This is a civil rights case.  Plaintiff, Sally A. Fath,

administratrix of the estate of her son, Roger W. Fath, brings this

action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983

("section 1983") against defendants Borough of Coraopolis d/b/a

Coraopolis Borough Police Department ("CBPD") and officers Shawn

Quinn, Jason Stewart, John Haring, and Tony Barravecchio for

failing to prevent her son's suicide.[1]  On September 1, 2006, Mr.

Fath hanged himself with his socks in a holding cell at the CBPD

after he had been arrested for public intoxication.  Plaintiff

alleges that defendant officers falsely arrested Mr. Fath and were

---

[1]  Initially, plaintiff named the CBPD as well as officers Brad
Graham, Giovanni Trello, and A.J. Marx as defendants in this
case.  On October 9, 2009, we granted the parties' stipulation
to dismiss all of these defendants.  [Doc. No. 24].

recklessly indifferent to his serious medical needs in violation of Mr. Fath's rights under the Fourth and Fourteenth Amendments of the United States Constitution (Count I).[2]  Plaintiff alleges that the Borough of Coraopolis condoned defendant officers' unlawful actions because those actions were taken pursuant to a policy, practice, or custom of the CBPD, and because the Borough of Coraopolis failed to properly train the officers in suicide risk identification and prevention (Count II).  In addition, plaintiff asserts state law claims for wrongful death (Count III), survival (Count IV), and indemnification (Count V) against all defendants.  Plaintiff seeks monetary damages.

Plaintiff and defendants have filed cross-motions for summary judgment. [Doc. Nos. 25 & 29].  Both parties argue that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

Defendants contend that plaintiff cannot establish that defendants violated Mr. Fath's constitutional rights under the circumstances of this case, and even if she could, defendants are entitled to qualified immunity for their actions.  Defendants also

---

[2]

Because Mr. Fath was a pretrial detainee when he hanged himself, plaintiff's claim is analyzed under the Fourteenth Amendment's substantive due process protection against arbitrary abuse of government power instead of the Eighth Amendment prohibition against cruel and unusual punishment. Woloszyn v. County of Lawrence, 396 F.3d 314, 321 n.5 (3d Cir. 2005) (citation omitted). For this reason, we granted the parties' stipulation to dismiss plaintiff's Eighth Amendment claims on October 9, 2009. [Doc. No. 24].

argue that plaintiff's state law claims[3] are barred by Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. § 8541, et seq.

Plaintiff contends she is entitled to summary judgment because: (1) defendants were on notice, via an incident that occurred five weeks prior to Mr. Fath's suicide, that Mr. Fath had a particular vulnerability to suicide, and (2) defendants were recklessly indifferent to that vulnerability in their treatment of Mr. Fath and, specifically, in their failure to remove his socks prior to placing him in a CBPD holding cell on September 1, 2006. Plaintiff further contends that summary judgment should be granted in her favor because the actions of the officers were taken pursuant to a custom, policy, or practice of the Borough of Coraopolis, and the Borough of Coraopolis failed to provide its officers with training regarding suicide risk identification and prevention.

During oral argument on the parties' cross-motions for summary judgment, plaintiff withdrew: (1) her Fourth Amendment unlawful arrest claims as to all defendants, and (2) all of her

---

[3]
Although plaintiff's complaint mentions in passing that she brings suit under the Fourth and Fourteenth Amendments to the Pennsylvania Constitution, she failed to set forth specific counts regarding any state constitutional claims and failed to mention such claims in the summary judgment briefing or at oral argument. To the extent that plaintiff has not already abandoned such claims, they are dismissed with prejudice.

claims against defendant officers Shawn Quinn, John Haring, and Tony Barravecchio.  What remains are section 1983 claims against officer Stewart and the Borough, and state law claims.

For the reasons set forth below, the court will grant defendants' motion for summary judgment and will deny plaintiff's motion.

I.    FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

This civil rights claim arises out of the death of Mr. Fath, who committed suicide in a CBPD holding cell.  Plaintiff's claim focuses on two encounters that Mr. Fath had with officer Stewart and the CBPD that took place on September 1, 2006, and on July 23, 2006.  We will address each one separately below.

A.    September 1, 2006 Incident

On September 1, 2006, CBPD officers Tony Barravecchio, Shawn Quinn, and Jason Stewart, along with detective A.J. Marx were on duty when a concerned citizen called the CBPD regarding a man, later determined to be Mr. Fath, who appeared to be intoxicated and was walking with a small child on Montour Street in Coraopolis, Pennsylvania.

Officers Quinn and Stewart arrived at the scene first and found Mr. Fath smelling of alcohol with red, glassy eyes,

4

struggling to maintain his balance, and dragging a four-year-old girl, later determined to be Mr. Fath's daughter, along by her wrist while she was screaming and crying. When officers Quinn and Stewart attempted to speak with Mr. Fath, he became combative. Officer Quinn arrested Mr. Fath for public intoxication.[4] Once he was placed under arrest, Mr. Fath became belligerent and resisted being placed in handcuffs. He spit on and screamed profanities at the officers.

Officer Barravecchio and detective Marx arrived at the scene after Mr. Fath was arrested. While officers Quinn and Stewart transported Mr. Fath to the CBPD, officer Barravecchio and detective Marx took Mr. Fath's daughter back to Mr. Fath's residence only to find an eight-year-old boy alone at the residence. Officers Quinn and Stewart took both children into custody and transported them back to the police station.

Upon arriving at the CBPD with Mr. Fath, officer Quinn removed Mr. Fath's belt and shoelaces before placing him inside of

---

[4]

Mr. Fath was ultimately charged with the following crimes: (1) Aggravated Harassment by a Prisoner, 18 Pa. Cons. Stat. § 2703.1; (2) Recklessly Endangering Another Person, 18 Pa. Cons. Stat. § 2705; (3) Endangering Welfare of Children, 18 Pa. Cons. Stat. § 4304; (4) Resisting Arrest or Other Law Enforcement, 18 Pa. Cons. Stat. § 5104; and (5) Public Drunkenness and Similar Misconduct, 18 Pa. Cons. Stat. § 5505. [Doc. No. 26, at Ex. 19].

the holding cell pursuant to CBPD procedures.[5] None of the officers removed or attempted to remove Mr. Fath's socks.

While in the holding cell, Mr. Fath continued to spit at officers while yelling profanities and repeatedly shaking the jail cell bars, until officer Stewart sprayed Mr. Fath's face with pepper spray in an attempt to calm Mr. Fath down.  Officer Stewart then called Emergency Medical Services ("EMS"). Shortly thereafter, EMS arrived and treated Mr. Fath.  According to the EMS incident report, when asked by EMS personnel how many drinks he had, Mr. Fath replied "four drinks," while indicating that each one was approximately twelve to fourteen inches high.  [Doc. No. 26, at Ex. N]. Other than information relating to Mr. Fath's intoxication, the EMS incident report indicated that the examination of Mr. Fath was "unremarkable," and that Mr. Fath did not want to go to the hospital.  [Id.]

In the meantime, officer Barravecchio called Children Youth & Family Services ("CYF") regarding Mr. Fath's daughter. Around 9:30 p.m., a representative of CYF arrived at the police station.  According to the CBPD incident report, around 10:50 p.m., the CYF representative explained to Mr. Fath that his daughter

---

[5]

Section IV.C. of the CBPD's Policies and Procedures Manual states that "[t]he prisoner will be thoroughly searched and relieved of all personal items to include belts, jewelry, shoelaces, as well as any other articles which would be considered dangerous to the prisoner or others." [Doc. No. 26, at Ex. L-1].

would be taken into CYF's custody, placed into foster care, and a hearing would be held a few days later that he should try to attend.  The representative from CYF testified that Mr. Fath said and did nothing in her presence that evening to indicate to her that he was having mental health issues or was suicidal.

At approximately 11:15 p.m., officer Barravecchio went into the holding cell area and found that Mr. Fath had hanged himself with his socks. Officer Barravecchio yelled for help, opened the cell door, and picked Mr. Fath up in order to relieve the pressure around his neck.  Several officers ran into the cell block to assist officer Barravecchio. The officers cut Mr. Fath's socks down, administered CPR, and called an ambulance.  Mr. Fath died two days later at Allegheny General Hospital in Pittsburgh, Pennsylvania.

### B.    The July 23, 2006 Incident

On July 23, 2006, five weeks prior to his suicide, Mr. Fath was wandering around the parking lot of the CBPD, identified himself to officer Stewart, and stated that he wanted to sign himself into the hospital. In response, officer Stewart brought Mr. Fath inside the police station.  According to officer Stewart, he noticed a strong smell of alcohol coming from Mr. Fath's breath, his glassy, blood shot eyes, and his slurred speech. Mr. Fath informed officer Stewart that "his life was falling apart and [he] wanted to talk to a doctor."  [Doc. No. 26, at Ex. R].  Mr. Fath

also kept saying that "the fans were driving him crazy ... [and] he wanted to sign himself in." [Id.]  Nothing in the record indicates that Mr. Fath informed officer Stewart that he was suicidal on July 23, 2006.  At the request of Mr. Fath, officer Stewart had a CBPD dispatcher call an ambulance, which transported Mr. Fath to Sewickley Valley Hospital.  Although Mr. Fath was not arrested, an incident report was electronically filed at the CBPD and was categorized under "mental health."  [Id.]

An EMS report was also created for the July 23, 2006 incident.  That report indicates that when EMS arrived, Mr. Fath was sitting in a chair at the CBPD "with thoughts of harming himself or others." [Doc. No. 32, Appx. at pp. 34-35].  According to the EMS report, Mr. Fath had walked to the CBPD after having domestic problems and requested that he be transported to the hospital so that he could talk to someone.  Mr. Fath stated that "the fans in the residence were bothering him and that his girlfriend would not turn them off." [Id.]  Mr. Fath also stated that "he had thoughts of harming himself or others, and stated he felt like a demon a lot of the time."  [Id.]  He complained of chest pain, shortness of breath, nausea, and dizziness.  Mr. Fath also admitted to having consumed five beers that night.

Plaintiff did not submit any evidence indicating that officer Stewart knew what Mr. Fath said to EMS personnel on July 23, 2006.  Nothing in the record suggests that officer Stewart knew

or had any reason to know of the contents of the July 23, 2006 EMS report.  Officer Stewart testified that he was not present when EMS personnel interviewed Mr. Fath, and that he did not follow up with EMS personnel or Sewickley Valley Hospital regarding Mr. Fath's status.  The record is silent as to what, if any, diagnosis and/or treatment Mr. Fath underwent while a patient at the Sewickley Valley Hospital.

II.  <u>STANDARD OF REVIEW</u>

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, <u>i.e.</u>, the material facts, however, will preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. <u>Id</u>. In determining whether the dispute is genuine, the court's function is not to

weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

The United States Supreme Court has "emphasized, [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotations omitted) (quoting Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In summary, the inquiry on a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute, or whether the evidence is so one-sided that the movant must prevail as a matter of law.

It is on this standard that the court has reviewed the parties' cross-motions for summary judgment. For the reasons that follow, the court will grant defendants' motion and will deny plaintiff's motion.

III.   DISCUSSION

         Plaintiff brings her federal claim pursuant to section
1983.  To state a claim under section 1983, a plaintiff must show
both that: (1) the offending conduct was committed by a person
acting under color of state law, and (2) that such conduct deprived
the plaintiff of a right secured by the United States Constitution.
Burella v. City of Philadelphia, 501 F.3d 134, 139 (3d Cir. 2007).
Here, the parties do not dispute that defendants were acting under
color of state law.  Therefore, the only issue we will address is
whether plaintiff has sufficiently established the deprivation of
a right secured by the United States Constitution as to officer
Stewart or the Borough of Coraopolis.

         A.   Section 1983 Claim Against Officer Stewart

         Mr. Fath was in the CBPD's custody when he committed
suicide. "Recognizing that a suicide is ultimately the result of a
prisoner's own self-destructive behavior, ... [courts have] noted
that a prison is not a guarantor of a prisoner's safety."  Estate
of Puza v. Carbon County, 586 F. Supp. 2d 271, 276 (M.D. Pa. 2007),
aff'd, 304 Fed. App'x 47 (3d Cir. 2008) (citing Freedman v. City of
Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988)). "A court 'cannot
infer from the prisoner's act of suicide itself that the prison
officials have recklessly disregarded their obligation to take
reasonable precautions to protect the safety of prisoners entrusted
to their care.'" Id.

However, under a narrow set of circumstances, a prisoner's or detainee's suicide may rise to the level of an infringement upon the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Litz v. City of Allentown, 896 F. Supp. 1401, 1408 (E.D. Pa. 1995) (citations omitted) (granting summary judgment on plaintiff's section 1983 claims). The Due Process Clause, however, is not implicated by the negligent act of an officer or official. Id. (citations omitted). "[L]iability requires more than ordinary lack of due care for the prisoner's interests or safety." Id. (citations and quotations omitted). Plaintiff bears the burden of proving that:

> (1) the detainee had a 'particular vulnerability to suicide';
>
> (2) the custodial officer or officers knew or should have known of that vulnerability; and
>
> (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability.

Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)) ("Colburn II"). "Absent proof of all three of these elements, [Mr. Fath's]...suicide would be an intervening cause, breaking the chain of liability for his death." Joines v. Twp. of Ridley, et al., No. 04-3430, 2006 WL 890829, at *1 (E.D. Pa. Apr. 4, 2006) (granting defendants' motion for summary judgment because, inter alia, plaintiff could not show that decedent posed a

12

substantial risk of suicide); <u>see also</u> <u>Barker-Puza</u>, 304 Fed. App'x at 48-49 (affirming district court's granting of summary judgment in favor of defendants because "plaintiffs failed to present evidence of their subjective appreciation of a particular vulnerability to suicide").

In <u>Colburn II</u>, the United States Court of Appeals for the Third Circuit explained in detail the meaning of a "particular vulnerability to suicide":

> The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

<u>Colburn II</u>, 946 F.2d at 1023 (citation and quotations omitted) (holding that intoxication does not create an issue of material fact regarding a particular risk of suicide).

In <u>Woloszyn</u>, the court of appeals elaborated upon this standard:

> A particular vulnerability to suicide represents a serious medical need. <u>Colburn II</u>, 946 F.2d at 1023. "The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition." <u>Colburn II</u>, 946 F.2d at 1024. "<u>[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur</u>." <u>Id</u>. (citations omitted).

396 F.3d at 320 (emphasis added) (finding no genuine issue of material fact as to whether a pre-trial detainee had a particular vulnerability to suicide, despite detainee's intoxication,

fluctuating moods, and reported distress about his family situation); see also Barker-Puza, 304 Fed. App'x at 4 (stating that "[t]he particular vulnerability 'speaks to the degree of risk inherent in the detainee's condition....'").

Mr. Fath hanged himself on September 1, 2006. However, no evidence exists tending to show that on that day, Mr. Fath threatened to commit suicide, exhibited suicidal tendencies, or made any comments indicating that he had or was having suicidal thoughts. The sole evidence of Mr. Fath's alleged vulnerability to suicide on September 1, 2006 arises out of his encounter with officer Stewart on July 23, 2006. Plaintiff argues that the July 23, 2006 incident, standing alone, establishes that Mr. Fath had a particular vulnerability to suicide more than five weeks later on September 1, 2006, and that officer Stewart knew or should have known of that vulnerability. We disagree.

The police incident report from Mr. Fath's July 23, 2006 encounter with officer Stewart indicates that Mr. Fath told officer Stewart that "his life was falling apart and [he] wanted to talk to a doctor." [Doc. No. 26, Ex. R]. Mr. Fath also repeatedly told officer Stewart that "the fans were driving him crazy ... and he wanted to sign himself in." [Id.] The police incident report indicated that, in response to Mr. Fath's complaints, an ambulance was called and Mr. Fath was taken to the hospital. The police report does not indicate that Mr. Fath told officer Stewart that he

wanted to kill himself or that he was suicidal. Accordingly, the July 23, 2006 incident report does not satisfy plaintiff's burden to establish a particular vulnerability to suicide that officer Stewart knew or should have known about on September 1, 2006.

Although the EMS report reflects that Mr. Fath expressed suicidal thoughts to the EMS personnel, there is no evidence indicating that officer Stewart was present or made aware of Mr. Fath's statements to the EMS personnel or that he ever knew, or had reason to know, of the contents of the July 23, 2006 EMS report.

However, even if officer Stewart had known about the contents of the EMS report, as well as recalled all of the details of his own encounter with Mr. Fath five weeks prior, the circumstances surrounding the July 23, 2006 incident still would not meet the legal requirements for establishing a particular vulnerability to suicide on September 1, 2006.[6] No reasonable jury could conclude that the July 23, 2006 incident created a "strong likelihood" that Mr. Fath would suffer self-inflicted harm five weeks later.[7]

---

[6]

Plaintiff's own expert is of little assistance to the court as he presupposes that Mr. Fath had a particular vulnerability to suicide on September 1, 2006 because of the July 23, 2006 incident. [See Doc. No. 43, Ex. 1]. That is the dispositive issue in this case.

[7]

The fact that the July 23, 2006 police incident report was classified under "Mental Health" in the police department's computer system does not change this result. The substance of this report remains the same and the classification alone does

15

Moreover, as the court of appeals stated in Colburn II, in order for a plaintiff to recover, the decedent's mental "condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." 946 F.2d at 1023.   Plaintiff has failed to present any evidence that Mr. Fath was diagnosed by a physician as requiring treatment for any mental condition at any time in his life, let alone on July 23, 2006 (or September 1, 2006, for that matter).   The record is completely devoid of any evidence, such as hospital records, medical reports, or similar evidence reflecting actual, prior suicide attempts by Mr. Fath or a history of any particular mental health problems.

Also absent from the record is any evidence that officer Stewart knew or should have known that Mr. Fath was suicidal based on his behavior on the night of his attempted suicide, September 1, 2006.   Nothing about Mr. Fath's behavior that evening was "so obvious that a lay person would easily recognize the necessity for a doctor's attention." Plaintiff's own expert does not even suggest that Mr. Fath's behavior on September 1, 2006 exhibited a heightened risk of suicide or was such that a failure to treat Mr.

---

not establish a particular vulnerability to suicide by Mr. Fath on September 1, 2006.   It would be improper to assume that all individuals suffering from any mental health concern are suicidal.

16

Fath could be expected to lead to substantial and unnecessary suffering, injury, or death. [See Doc. No. 43, Ex. 1]. Rather, several witnesses have testified that Mr. Fath's behavior on September 1, 2006 was consistent with that of any other intoxicated detainee, and the court of appeals has recognized that intoxication does not trigger an officer's duty to guard against self-inflicted harm.  Colburn II, 946 F.2d at 1026-27 (citing cases).

Rather, the record indicates that on the night in question, Mr. Fath smelled of alcohol, his eyes were red and glassy, his speech was slurred, and he was having trouble maintaining his balance. When he was arrested, Mr. Fath became combative, belligerent, and resisted being placed in handcuffs. He spit on and screamed profanities at the officers. Once transported back to the police station, Mr. Fath continued to scream profanities and spit on officers. He also repeatedly shook the holding cell bars at the CBPD.

Absent from the record is any evidence that Mr. Fath threatened to commit suicide, exhibited suicidal tendencies, or made any comments indicating that he had or was having suicidal thoughts or that he was taking any medication for mental illness on September 1, 2006. Mr. Fath's behavior that night in no way demonstrated that he was inclined toward self-inflicted harm or that he was in serious need of mental health attention.

Having failed to establish that Mr. Fath's behavior on

17

the night in question was indicative of a particular vulnerability to suicide and that officer Stewart knew or should have known of that vulnerability, plaintiff has failed to meet her burden. However, assuming arguendo that plaintiff could meet the first two prongs of the Colburn II/Woloszyn test, plaintiff still cannot not establish the third prong, that officer Stewart acted with reckless indifference towards Mr. Fath's vulnerability to suicide.

The reckless indifference prong recognizes "a necessary link between the prison official's knowledge and his disregard of the prisoner's particular risk." Schuenemann v. United States, et al., No. 05-2565, 2006 WL 408404, at *5 (3d Cir. Feb. 23, 2006). "Although the court of appeals has not yet developed the exact contours of the third prong, it has suggested that it is similar to the 'deliberate indifference' standard applied to a claim brought under the Eighth Amendment, which requires the plaintiff to prove that the prison official 'know[s] of and disregard[s] an excessive risk to inmate health and safety.'" Id. (citing Woloszyn, 396 F.3d at 321) (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001)).

No reasonable jury could find that officer Stewart acted with reckless indifference on either July 23, 2006 or September 1, 2006. On July 23rd, when Mr. Fath approached officer Stewart and informed him that he was in need of medical attention, officer Stewart responded by calling an ambulance to take Mr. Fath to the

18

hospital.  On September 1, 2006, there is no evidence in the record
that Mr. Fath exhibited any need for medical treatment. In fact,
according to the EMS report, Mr. Fath refused to go to the hospital
that day.   Moreover, despite Mr. Fath's hostile conduct towards
officer Stewart, screaming profanities at him and spitting on him,
the record indicates officer Stewart was trying to control Mr. Fath
for his own safety. When officer Stewart sprayed Mr. Fath with
pepper spray to calm him down, officer Stewart removed him from the
cell, permitted him to wash his eyes out, and immediately called
EMS to treat him.   Along with other CBPD officers, officer Stewart
also managed to arrest Mr. Fath and bring him back to the CBPD
without injuring him, although Mr. Fath was combative and resisted
arrest.

       On September 1, 2006, officer Quinn, acting pursuant to
Section IV.C. of the CPBD's Policies and Procedures manual, as a
precaution against suicide, removed Mr. Fath's belt and shoelaces
before placing him inside the holding cell.   This fact does not
help  plaintiff  establish  that  defendants  were  deliberately
indifferent to Mr. Fath's risk of suicide.  Rather, it establishes
the  opposite.   In short, officer Stewart did not disregard Mr.
Fath's risk of suicide simply because officer Quinn did not also
take Mr. Fath's socks.

       Plaintiff has failed to come forward with any evidence
indicating that officer Stewart was recklessly indifferent towards

Mr. Fath's medical needs on September 1, 2006 or July 23, 2006. Accordingly, plaintiff cannot recover against officer Stewart under the Colburn II/Woloszyn test, and defendants' motion for summary judgment on plaintiff's section 1983 claim against officer Stewart will be granted.

Our decision here is in accord with the great weight of the case law in this jurisdiction. Plaintiff did not identify, and this court could not find, a case in this appellate jurisdiction where defendant officers or municipalities were found liable for a prisoner's or a detainee's suicide under section 1983.[8] At oral argument, plaintiff contended that this case is "virtually identical" to Duerring v. Somerset County, et al., No. 06-0247, 2007 WL 2310865 (W.D. Pa. Aug. 9, 2007) (Schwab, J.), where the court denied defendants' motion for summary judgment.[9] We disagree.

Unlike Mr. Fath, Mr. Duerring had previous incarcerations

---

[8]

Instead, the court found several prisoner/detainee suicide cases where defendants' motions for summary judgment were granted. See, e.g., Williams v. Borough of West Chester, et al., 891 F.2d 458, 467 (3d Cir. 1989); Colburn II, 946 F.2d 1017, 1023 (3d Cir. 1991); Gunn v. City of Allentown, et al., No. 91-2341, 1992 WL 191144, at *9 (E.D. Pa. Aug. 3, 1992); Litz v. City of Allentown, 896 F. Supp. 1401, 1408 (E.D. Pa. 1995); Woloszyn v. County of Lawrence, 396 F.3d 314, 326 (3d Cir. 2005); Schuenemann v. United States, No. 05-2565, 2006 WL 408404, at *5 (3d Cir. Feb. 23, 2006); Joines v. Township of Ridley, No. 04-3430, 2006 WL 890829, at *3 (E.D. Pa. Apr. 4, 2006); Barker-Puza v. Carbon County, 304 Fed. App'x 47, 48 (3d Cir. 2008); Wargo v. Municipality of Monroeville et al., 646 F. Supp. 2d 777, 789 (W.D. Pa. 2009).

[9]

The parties settled this case prior to trial.

at the Somerset County Jail, and his prior jail admission forms from those incarcerations, which were on file, indicated that Mr. Duerring had been treated for mental illnesses, had attempted suicide in the past, had recently experienced a significant loss in his life, and had no place to live.  The "Suicide Assessment" portion of one of those forms indicated that Mr. Duerring had been treated for BiPolar Type 2, ADHD, and anxiety, and that he had been taking anti-psychotic and anti-anxiety drugs.  It also indicated that Mr. Duerring had attempted suicide in the past and had considered suicide "all the time" because he was incarcerated and had "lost [his] mind."  The form further indicated that no one at the jail recognized any risk factors or took any precautionary measures, and that the staff at the jail had received little, if any, training in the recognition of at-risk-for-suicide detainees. Id. at *4-5.  In light of this evidence, the court denied defendants' motion for summary judgment even though the record indicated that Mr. Duerring appeared "normal" to other inmates and the jail staff on the night he committed suicide.  Id.

Mr. Fath's case is readily distinguishable from Duerring. As stated above, there is no evidence that Mr. Fath had been treated for or diagnosed with a mental illness, had been taking medication for any mental illness, or had attempted suicide in the past.  Due to the lack of such evidence, there was nothing that officer Stewart knew or should have known of regarding Mr. Fath's

21

mental state to which he could have exhibited reckless indifference. Accordingly, plaintiff has failed to set forth any evidence of reckless indifference on the part of officer Stewart, and the court will grant defendants' summary judgment motion as to this claim.

B.    Section 1983 Claim Against the Borough of Coraopolis

Plaintiff also brings a section 1983 claim against the Borough of Coraopolis. This claim may be divided into two theories of liability arising from: (1) the Borough's customs and policies regarding the handling of prisoners, the appropriate level of observation of prisoners, and safe housing, and (2) the Borough's alleged failure to properly train its police officers in suicide identification and prevention.

The law is clear that a section 1983 claim against a municipality cannot be predicated solely on the basis of vicarious liability.  Monell v. Dep't of Social Services of New York City, 436 U.S. 658, 691-95 (1978). However, a municipality may be sued directly under section 1983 if an action taken pursuant to a municipal policy, practice, or custom causes a constitutional harm. Id. at 691. In the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can only serve as a basis for section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] came into contact."

22

Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (quoting City of Canton v. Harris, 489 U.S. 378, 388-89 (1989)).

We need not analyze these theories in detail because plaintiff has not established that Mr. Fath indeed suffered a constitutional harm, which is a prerequisite for her section 1983 claim against the Borough of Coraopolis. To succeed under either of her theories of liability against the Borough of Coraopolis, plaintiff must establish that Mr. Fath's constitutional rights were violated. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) (holding that a municipal entity cannot be held liable for failing to train or supervise a police officer where there is no underlying constitutional violation by the individual officer); Wargo v. Municipality of Monroeville, 646 F. Supp. 2d 777, 789 (W.D. Pa. 2009) (finding no municipality liability and stating that plaintiff's "rights under the Fourth Amendment were not violated, and therefore, no Monell claim against Monroeville exists").

Here, we have already concluded that, as a matter of law, officer Stewart did not violate Mr. Fath's constitutional rights. Without any evidence that Mr. Fath suffered a constitutional harm, there can be no section 1983 claim against the Borough of Coraopolis. Accordingly, defendants' motion for summary judgment as to plaintiff's section 1983 claim against the Borough of Coraopolis will be granted.

C.  State Law Claims

In addition to her section 1983 claims, plaintiff asserts state law claims for wrongful death (Count III), survival (Count IV), and indemnification (Count V).

Having dismissed the federal claims in the lawsuit, we must decide whether to exercise supplemental jurisdiction over plaintiff's state law claims. Where all claims over which the district court has original jurisdiction are dismissed before trial, "the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (citations omitted). Here, considerations of judicial economy, convenience, and fairness to the parties weigh in favor of resolving the motions for summary judgment as they pertain to the state law claims as well.

Defendants contend that plaintiff's state law claims are barred by Pennsylvania Political Subdivision Tort Claims Act (the "Tort Claims Act" or "the Act"), 42 Pa. Cons. Stat. § 8541, et seq. Plaintiff did not address defendants' arguments regarding these claims in her briefs, and at oral argument, plaintiff's lead counsel was unaware that state law claims had been included in plaintiff's complaint. Therefore, plaintiff has conceded that these claims are not viable.

24

Nevertheless, we note that the Tort Claims Act grants local agencies and their employees immunity for civil damages on account of any injury to a person or property. 42 Pa. Cons. Stat. §§ 8541, 8545; see also Bornstad v. Honey Brook Twp., No. 03-3822, 2004 WL 1171244, at *4 (E.D. Pa. May 26, 2004) (holding that wrongful death and survival claims against various municipalities and their police departments based on police misconduct were barred on the basis of governmental immunity). Although the Act lists eight exceptions to governmental immunity, it is clear that none of them apply here.[10] 42 Pa. Cons. Stat. § 8542(b). Therefore, to the extent that plaintiff has not abandoned her state law claims for wrongful death, survival, and indemnification, they are barred by the Tort Claims Act.

Finally, plaintiff has brought an indemnification claim pursuant to 42 Pa. Cons. Stat. § 8548 in which she contends that the Borough of Coraopolis is required to indemnify its "employees, the individual police officers, for the payment of any judgment for damages resulting from a judicial determination that an act of either or any of [their] individual police officers were the cause and their actions were within the scope of the duties as police

_____

[10]

The eight exceptions are: (1) vehicle liability(2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals. 42 Pa. Cons. Stat. § 8542(b).

officers." [Doc. No. 1, at ¶ 51].  It is unclear to this court why plaintiff would bring a claim for indemnification on behalf of officer Stewart against the Borough of Coraopolis. Because this indemnification claim is barred by the Act, and further, because plaintiff lacks standing to raise it, we dismiss that claim with prejudice.

Accordingly, we will grant defendants' summary judgment motion as to plaintiff's state law claims.

IV.   CONCLUSION

The evidence plaintiff produced is insufficient to defeat defendants' motion for summary judgment.  No reasonable jury could find, based on this record, in favor of plaintiff on any of her claims.  Based on the foregoing analysis, defendants' motion for summary judgment will be granted, and plaintiff's motion for summary judgment will be denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SALLY A. FATH, Administratix of       )
the Estate of                         )
ROGER W. FATH, Deceased,              )
                                      )
                    Plaintiff,        )
                                      )
         v.                           )
                                      )   Civil Action No. 08-1216
BOROUGH OF CORAOPOLIS d/b/a           )
CORAOPOLIS BOROUGH POLICE             )
DEPARTMENT, SHAWN QUINN, JASON        )
STEWART, JOHN HARING, and             )
TONY BARRAVECCHIO,                    )
                                      )
                    Defendants.       )

## ORDER

AND NOW, this 3 day of May  , 2010, upon consideration
of the parties' cross-motions for summary judgment [Doc. Nos. 25 &
29], the briefs, exhibits, and oral argument related thereto, IT IS
HEREBY ORDERED that defendants' motion for summary judgment is
GRANTED, and plaintiff's motion for summary judgment is DENIED.

The Clerk of Court is directed to mark this case closed.

BY THE COURT:

_____, C.J.

cc: All counsel of record